1

2

3

4

5

6

7

```
FILED
CLERK, U.S. DISTRICT COURT

10/28/25

CENTRAL DISTRICT OF CALIFORNIA
BY:        MRV        DEPUTY
```

8                    UNITED STATES DISTRICT COURT

9             FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                      January 2025 Grand Jury

11   UNITED STATES OF AMERICA,              CR 2:25-cr-00886-CV

12              Plaintiff,                  I N D I C T M E N T

13              v.                          [21 U.S.C. § 846: Conspiracy to
                                            Distribute and Possess with Intent
14   RYAN JAMES WEDDING,                    to Distribute Cocaine; 21 U.S.C.
        aka "James Conrad King,"            § 963: Conspiracy to Export
15      aka "Jesse King,"                   Cocaine; 21 U.S.C. §§ 846,
        aka "Jessi,"                        848(e)(1)(A): Conspiracy to Commit
16      aka "~j,"                           Murder in Connection with a
        aka "~R137,"                        Continuing Criminal Enterprise and
17      aka "~PE,"                          Drug Crime and Murder in
        aka "~3.14,"                        Connection with a Continuing
18      aka "~EL COCO,"                     Criminal Enterprise and Drug
        aka "R,"                            Crime; 18 U.S.C. § 1512(a)(1)(A),
19      aka "RW,"                           (C), (3)(A), (k): Conspiracy to
        aka "JJ,"                           Tamper with a Witness, Victim, or
20      aka "Jessie New,"                   an Informant and Tampering with a
        aka "Jes Old,"                      Witness, Victim, or Informant by
21      aka "Mexi,"                         Completed Murder; 18 U.S.C.
        aka "El Guerro,"                    § 1513(a)(1)(A), (B), (2)(A), (f):
22      aka "El Jefe,"                      Conspiracy to Retaliate Against a
        aka "El Toro,"                      Witness, Victim, or an Informant
23      aka "Boss,"                         and Retaliation Against a Witness,
        aka "Buddy,"                        Victim, or an Informant by
24      aka "Giant,"                        Completed Murder; 18 U.S.C. §
        aka "Grande,"                       1956(h): Conspiracy to Launder
25      aka "Public,"                       Monetary Instruments; 21 U.S.C.
        aka "Public Enemy,"                 §§ 853 and 970, 18 U.S.C. §§ 981,
26      aka "NPKY8WY7,"                     982, and 924(d): Criminal
        aka "FUJ93HXR,"                     Forfeiture]
27      aka "PW7RJ83R,"
        aka "KJ5JW6HM,"
28      aka "NXYS6JC9,"

```
     aka "8DC7CAYB,"
     aka "49T9KYR9,"
     aka "T9PHWCJY,"
     aka "YF4TTY4K,"
DEEPAK BALWANT PARADKAR,
     aka "cocaine_lawyer,"
     aka "Deepaj Emergency,"
     aka "Descartes,"
     aka "K8KDZKW8,"
     aka "A5VB2FX6,"
     aka "Z9W7ETCU,"
     aka "criminal_lawyer@me.com,"
ATNA OHNA,
     aka "Tupac,"
     aka "~Kim Jong -Un,"
     aka "~kim jong Un,"
     aka "6Z3DKEPC,"
     aka "DR8CF76E,"
CARMEN YELINET VALOYES FLOREZ,
     aka "~negra,"
     aka "7JKF6Y5A,"
WILSON RIASCOS,
     aka "Pepe,"
ROLAN SOKOLOVSKI,
     aka "The Jew,"
     aka "~Sushi,"
     aka "Applepie,"
     aka "Lakers2,"
     aka "Fiji2,"
     aka "6777F2HA,"
     aka "HESR73RN,"
     aka "4K6S66FC,"
     aka "deem1313@live.ca,"
RASHEED PASCUA HOSSAIN,
     aka "Sheed,"
     aka "~JP Morgan,"
     aka "JP,"
BIANCA CANASTILLO-MADRID,
     aka "Bianca Canastillo
      Madrid,"
     aka "Bianca Madrid,"
     aka "~cady,"
     aka "Claudio,"
     aka "Claudi Old New Is
      Candy,"
     aka "TK8658TT,"
     aka "B9R3SBWT,"
ALLISTAIR CHAPMAN,
     aka "😂,"
     aka "⚡,"
     aka "Ali Star,"
     aka "R9BSX52X,"
     aka "PVMTRY34,"
TOMMY DEMORIZI,
AHMAD NABIL ZITOUN,
```

2

```
 1        aka "Ahmad Nabil Zaitoun,"
          aka "Ahmad Zaitoon,"
 2        aka "Activs Cousin,"
          aka "Ynotbro,"
 3        aka "T8PR3Y8R,"
     GURSEWAK SINGH BAL,
 4        aka "The Dirty News,"
          aka "thedirtynewz,"
 5        aka "@6ixaktv,"
          aka "@6ixak_tv,"
 6        aka
             "sixademiks6@hotmail.com,"
 7   EDWIN BASORA-HERNANDEZ,
          aka "Edwin Hernandez,"
 8        aka "Ed Winter,"
     YULIETH KATHERINE TEJEDA,
 9        aka "ana.kata1992,"
     FNU LNU 1,
10   FNU LNU 2,
     FNU LNU 3,
11   FNU LNU 4,
     FNU LNU 5,
12
                Defendants.
13
```

14        The Grand Jury charges:

15        At times relevant to this Indictment:

16                    INTRODUCTORY ALLEGATIONS

17   A.   The Wedding Criminal Enterprise

18        1.    Defendants RYAN JAMES WEDDING also known as ("aka") "James

19   Conrad King," "Jesse King," "Jessi," "~j," "~R137," "~PE," "~3.14,"

20   "~EL COCO," "R," "RW," "JJ," "Jessie New," "Jes Old," "Mexi," "El

21   Guerro," "El Jefe," "El Toro," "Boss," "Buddy," "Giant," "Grande,"

22   "Public," "Public Enemy," "NPKY8WY7," "FUJ93HXR," "PW7RJ83R,"

23   "KJ5JW6HM," "NXYS6JC9," "8DC7CAYB," "49T9KYR9," "T9PHWCJY," and

24   "YF4TTY4K," DEEPAK BALWANT PARADKAR, aka "cocaine_lawyer," "Deepaj

25   Emergency," "Descartes," "K8KDZKW8," "A5VB2FX6," "Z9W7ETCU," and

26   "criminal_lawyer@me.com," ATNA OHNA, aka "Tupac," "~Kim Jong -Un,"

27   "~kim jong Un," "6Z3DKEPC," and "DR8CF76E," CARMEN YELINET VALOYES

28   FLOREZ, aka "~negra," and "7JKF6Y5A," WILSON RIASCOS, aka "Pepe,"

ROLAN SOKOLOVSKI, aka "The Jew," "~Sushi," "Applepie," "Lakers2," "Fiji2," "6777F2HA," "HESR73RN," "4K6S66FC," and "deem1313@live.ca," RASHEED PASCUA HOSSAIN, aka "Sheed," "~JP Morgan," and "JP," BIANCA CANASTILLO-MADRID, aka "Bianca Canastillo Madrid," "Bianca Madrid," "~cady," "Claudio," "Claudi Old New Is Candy," "TK8658TT," and "B9R3SBWT," ALLISTAIR CHAPMAN, aka "😇," "⚡," "Ali Star," "R9BSX52X," and "PVMTRY34," TOMMY DEMORIZI, AHMAD NABIL ZITOUN, aka "Ahmad Nabil Zaitoun," "Ahmad Zaitoon," "Activs Cousin," "Ynotbro," and "T8PR3Y8R," GURSEWAK SINGH BAL, aka "The Dirty News," "thedirtynewz," "@6ixaktv," "@6ixak_tv," and "sixademiks6@hotmail.com," EDWIN BASORA-HERNANDEZ, aka "Edwin Hernandez," and "Ed Winter," YULIETH KATHERINE TEJEDA, aka "ana.kata1992," FNU LNU 1, FNU LNU 2, FNU LNU 3, FNU LNU 4, and FNU LNU 5, and others known and unknown to the Grand Jury, were leaders, members, and associates of a transnational criminal organization (the "Wedding Criminal Enterprise") that engaged in, among other things, murder, witness tampering, witness retaliation, the laundering of monetary instruments, and drug trafficking.

2.    On or about November 30, 2009, defendant WEDDING was convicted of conspiracy to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), in the United States District Court for the Southern District of California, case number 3:08-cr-02386-JM-3.  No later than on or about December 7, 2011, when he was released from United States federal prison, defendant WEDDING founded the Wedding Criminal Enterprise.

3.   On or about October 17, 2024, the United States Attorney's Office for the Central District of California announced the unsealing of a first superseding indictment against defendant WEDDING, his second-in-command Andrew Clark, and other co-conspirators, including, but not limited to, Nahim Jorge Bonilla, Rakhim Ibragimov, Andres Felipe Puccetti Iriarte, and Juan Manuel Quiroz Jimenez, charging them with assorted drug trafficking related offenses.  (United States v. Ryan James Wedding, et al., 2:24-cr-00369(A)-SPG (C.D. Cal.), "Wedding I".)  A photograph of defendant WEDDING is provided below.



4.   The Wedding Criminal Enterprise, a billion-dollar drug trafficking organization (DTO) and the largest supplier of cocaine to Canada, operated in Mexico, Colombia, Canada, and the United States, among other countries.

5.   The Wedding Criminal Enterprise sourced its cocaine from Colombia, cooking and testing it in "cocaine kitchens" run collaboratively with a Colombian neo-paramilitary group and drug cartel.

6.   The Wedding Criminal Enterprise, working in conjunction with members and associates of prominent Mexican drug cartels, utilized boats and planes to move hundreds of kilograms of cocaine

from Colombia to Mexico at a time.  The Wedding Criminal Enterprise then used semi-trucks to smuggle the cocaine across the United States-Mexico border.

7.    The Southern California Counties of Los Angeles, San Bernardino, and Riverside generally served as the "hub" where the Wedding Criminal Enterprise's cocaine was stored before being conveyed by Canadian drug transportation networks ("TPs") to final destinations in Canada and other American states, with the cocaine predominantly being distributed in Canada.

8.    Defendant WEDDING and Clark engaged in a "continuing criminal enterprise," as defined by Title 21, United States Code, Section 848(c).

B.    The Purposes of the Criminal Enterprise

9.    The purposes of the Wedding Criminal Enterprise included, but were not limited to, the following:

a.    Enriching members and associates of the Wedding Criminal Enterprise, including its leaders, defendant WEDDING and Clark, through the trafficking of cocaine in Mexico, Colombia, Canada, the United States, and elsewhere;

b.    Establishing control over the Canadian drug trade;

c.    Preserving, protecting, promoting, and expanding the power of defendant WEDDING, Clark, and the Wedding Criminal Enterprise using intimidation, violence, and threats of violence;

d.    Violently retaliating against:

i.    rival drug traffickers who challenged defendant WEDDING, Clark, and the Wedding Criminal Enterprise's authority and attempted to encroach upon defendant WEDDING and the Wedding Criminal Enterprise's sphere of influence;

6

1          ii.    individuals who had fallen out of favor with

2  defendant WEDDING, Clark, and the Wedding Criminal Enterprise; and

3          iii. individuals who were believed to be cooperating

4  with law enforcement against defendant WEDDING, Clark, and the

5  Wedding Criminal Enterprise.

6  C.    Means and Methods of the Criminal Enterprise

7       10.   The means and methods by which the members and associates

8  of the Wedding Criminal Enterprise conducted and participated in the

9  conduct of the affairs of the Wedding Criminal Enterprise included,

10 but were not limited to, the following:

11         a.    Members and associates of the Wedding Criminal

12 Enterprise trafficked cocaine to generate revenue for the enterprise.

13         b.    Members and associates of the Wedding Criminal

14 Enterprise promoted a climate of fear through acts of violence and

15 threats to commit acts of violence.

16         c.    Members and associates of the Wedding Criminal

17 Enterprise committed, attempted to commit, conspired to commit, and

18 threatened to commit acts of violence, including murder, to preserve,

19 protect, promote, and expand the Wedding Criminal Enterprise's drug

20 trafficking operations.

21 D.    The Criminal Enterprise's Organizational Structure

22      11.   The Wedding Criminal Enterprise hued to a traditional

23 hierarchical structure with defendant WEDDING and Clark operating at

24 the helm.  While residing in Mexico, defendant WEDDING and Clark

25 carefully monitored the enterprise's day-to-day criminal activity.

26 Specifically, using GrapheneOS cellular phones, they reviewed the

27 enterprise's finances, relayed kill orders, directed cocaine

28 shipments, and otherwise managed the enterprise's daily operations.

12.   The Wedding Criminal Enterprise also comprised:

a.   dispatchers located in Mexico, Canada, and the United States responsible for picking up, storing, and distributing the enterprise's cocaine;

b.   financiers who served as de facto banks for the enterprise's drug proceeds and who obfuscated the source of the funds by investing in high-value items, such as luxury cars, watches, jewelry, vehicles, and artwork, and making personal and business-related payments at defendant WEDDING and Clark's request; and

c.   sicarios who were recruited and paid by the enterprise for the purpose of murdering perceived rivals, disfavored persons, and supposed cooperators.

13.   In addition, the Wedding Criminal Enterprise contracted with sources of supply in Colombia responsible for manufacturing, testing, and shipping the enterprise's cocaine.

E.    Defendant Members and Associates of the Criminal Enterprise

14.   Defendant WEDDING, a Canadian citizen, resident of Mexico, and former Olympic snowboarder, was the leader of the Wedding Criminal Enterprise.  Defendant WEDDING oversaw the enterprise's entire operation and enriched himself with the enterprise's laundered drug proceeds.  To eliminate threats and otherwise advance the interests of the Wedding Criminal Enterprise, defendant WEDDING issued orders to murder various individuals, including an order to kill Victim A, which resulted in Victim A's death, and an order to kill a Canadian TP dispatcher and drug trafficking co-conspirator (CC-1), which led to the deaths of Victims B and C and the serious bodily injury of Victim D.

15.   Defendant PARADKAR, a dual Indian-Canadian citizen, resident of Canada, and criminal barrister, was a member and associate of the Wedding Criminal Enterprise.   Defendant PARADKAR advised defendant WEDDING and Clark to murder Victim A so that they would avoid extradition from Mexico on the criminal charges in Wedding I.   In addition, defendant PARADKAR provided and offered to provide defendant WEDDING and Clark with, among other things: (a) court documents and discovery that they would not otherwise have access to; and (b) access to enterprise members and associates who were either arrested, indicted, or under investigation through attorneys whose representation defendant PARADKAR secured.

16.   Defendant OHNA, a Canadian citizen and resident, was a member and associate of the Wedding Criminal Enterprise.   Defendant OHNA, a hired sicario, facilitated Victim A's murder.

17.   Defendant FLOREZ, a resident and citizen of Colombia, operated a network of commercial sex workers and was a member and associate of the Wedding Criminal Enterprise.   Defendant FLOREZ used her network of commercial sex workers, which included defendant TEJEDA, to locate Victim A in Medellín, Colombia, so that Victim A could be murdered.

18.   Defendant RIASCOS, a Colombian citizen and resident, and cocaine lab manager, was a member and associate of the Wedding Criminal Enterprise.

19.   Defendant SOKOLOVSKI, a Lithuanian-Canadian citizen, resident of Canada, professional poker player, jeweler, and procurer, was a member and associate of the Wedding Criminal Enterprise. Defendant SOKOLOVSKI managed and laundered the Wedding Criminal

9

Enterprise's drug proceeds and acquired luxury items for defendant WEDDING and Clark.

20.   Defendant HOSSAIN was a member and associate of the Wedding Criminal Enterprise.  Defendant HOSSAIN managed and laundered the Wedding Criminal Enterprise's drug proceeds.

21.   Defendant CANASTILLO-MADRID, a dual citizen of Mexico and the United States and resident of Mexico, was a member and associate of the Wedding Criminal Enterprise.  Defendant CANASTILLO-MADRID managed and laundered the Wedding Criminal Enterprise's drug proceeds.

22.   Defendant CHAPMAN, a Canadian citizen and resident, was a member and associate of the Wedding Criminal Enterprise.  Defendant CHAPMAN paid defendant BAL, the operator of a Canadian urban news outlet (the Dirty News), not to post about defendant WEDDING and Clark.  In addition, defendant CHAPMAN provided defendant BAL with a photograph of Victim A and paid him to post the photograph so that Victim A could be located and killed.

23.   Defendant DEMORIZI, a Canadian citizen and resident, was a member and associate of the Wedding Criminal Enterprise.  Defendant DEMORIZI attempted to locate Victim A through defendant BASORA-HERNANDEZ so that Victim A could be killed.

24.   Defendant ZITOUN, a Canadian citizen and resident, was a member and associate of the Wedding Criminal Enterprise.  Defendant ZITOUN attempted to locate Victim A in Medellín and Mecca, Saudi Arabia so that Victim A could be killed.

25.   Defendant BAL, a Canadian citizen and resident, and the founder and operator of the Dirty News, was a member and associate of the Wedding Criminal Enterprise.  In exchange for payment, defendant

10

BAL agreed not to post about defendant WEDDING and Clark and posted a photograph of Victim A so that Victim A could be located and killed.

26. Defendant BASORA-HERNANDEZ, a Dominican citizen, resident of Canada, and Reggaeton artist, was a member and associate of the Wedding Criminal Enterprise. Defendant BASORA-HERNANDEZ provided defendant DEMORIZI with Victim A's contact information for the purpose of enabling the Wedding Criminal Enterprise to locate and kill Victim A.

27. Defendant TEJEDA, a Colombian citizen with permanent resident status in the United States and commercial sex worker, was a member and associate of the Wedding Criminal Enterprise. Defendant TEJEDA provided defendants WEDDING and FLOREZ with personal information concerning Victim A, so that the Wedding Criminal Enterprise could locate and kill Victim A.

28. Defendant LNU 1, a motorcyclist, conducted reconnaissance of Victim A by following Victim A to a restaurant in Medellín (the "Restaurant") before Victim A was murdered.

29. Defendant LNU 2, a motorcyclist, shot Victim A approximately five times in the head while he was eating at the Restaurant.

30. Defendant LNU 3, a driver, brought LNU 2 to the Restaurant prior to Victim A's murder, and following the murder, met with LNU 2 at a rendezvous point and further aided defendant LNU 2 in his flight.

31. Defendant LNU 4, a photographer, cased the Restaurant before Victim A arrived and, following Victim A's murder, photographed Victim A's dead body.

32.   Defendant LNU 5, a driver, picked defendant LNU 4 up from the Restaurant after Victim A's murder and assisted defendant LNU 4 in his flight.

F.   Non-Defendant Members and Associates of the Criminal Enterprise

33.   Clark, a Canadian citizen and resident of Mexico, was the second-in-command of the Wedding Criminal Enterprise.  Clark closely directed several of the enterprise's operations, specifically, drug trafficking in Canada and the execution of murders.  Clark enriched himself with the enterprise's laundered drug proceeds.  In addition, Clark paid defendant OHNA for his role in Victim A's murder.  Clark, along with defendant WEDDING, also issued an order to kill CC-1 that led to the deaths of Victims B and C and the serious bodily injury of Victim D.

34.   Ibragimov, a Canadian citizen and resident, was a TP dispatcher sent to the Central District of California to pick up cocaine from the Wedding Criminal Enterprise and deliver it to TP drivers hired to transport the cocaine to Canada.

35.   Bonilla, a Canadian citizen and resident of the Southern District of Florida, was a member and associate of the Wedding Criminal Enterprise who tested the purity of the enterprise's cocaine and distributed the enterprise's cocaine in Canada and the United States.

36.   Iriarte, a Colombian citizen and resident of Colombia, was a member and associate of the Wedding Criminal Enterprise sent to the Central District of California to deliver the enterprise's cocaine to TP dispatchers.

37.   Jimenez, a Mexican citizen and resident of the Central District of California, was a member and associate of the Wedding

12

Criminal Enterprise who managed the enterprise's stash house locations, delivered the enterprise's cocaine to TP dispatchers, and made bulk cash deliveries in the Central District of California on behalf of the enterprise.

38.  Maninderjit Singh Dhillon, a Canadian citizen and resident, was a TP driver responsible for transporting the Wedding Criminal Enterprise's cocaine.  Dhillon was charged in United States v. Maninderjit Dhillon, 4:24-cr-00197-LPR (E.D. Ark.) ("Dhillon") relating to his transportation of the Wedding Criminal Enterprise's cocaine in October 2024.

39.  Ranjodh Singh, a Canadian citizen and resident, was a TP driver responsible for transporting the Wedding Criminal Enterprise's cocaine.  Singh was charged in Dhillon relating to his transportation of the enterprise's cocaine in October 2024.

1

                                   COUNT ONE

2

                              [21 U.S.C. § 846]

3

    [DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS, SOKOLOVSKI,

4

    HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-

5

          HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

6

        40.   The Grand Jury realleges paragraphs 1 through 39 here.

7

A.   OBJECT OF THE CONSPIRACY

8

        41.   Beginning no later than on or about December 7, 2011, and

9

continuing until on or about October 28, 2025, in Los Angeles,

10

Riverside, and San Bernardino Counties, within the Central District

11

of California, in the countries of Mexico, Colombia, and Canada, and

12

elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS,

13

SOKOLOVSKI, HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN,

14

BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5,

15

and others known and unknown to the Grand Jury, conspired to

16

knowingly and intentionally distribute and possess with intent to

17

distribute at least five kilograms of a mixture and substance

18

containing a detectable amount of cocaine, a Schedule II narcotic

19

drug controlled substance, in violation of Title 21, United States

20

Code, Sections 841(a)(1), (b)(1)(A)(ii)(II).

21

B.   MANNER AND MEANS OF THE CONSPIRACY

22

        42.   The object of the conspiracy was to be accomplished, in

23

substance, as follows:

24

    Cocaine Trafficking

25

          a.   Defendant WEDDING would oversee the procurement of

26

cocaine from Colombia.

27

28

                                       14

b.    Defendant RIASCOS would manage a cocaine lab in Colombia that would manufacture, test, and ship cocaine for the enterprise.

c.    Members and associates of the Wedding Criminal Enterprise would import hundreds of kilograms of cocaine at a time primarily sourced from Colombia into the United States via the United States-Mexico border and store it in stash houses in the Central District of California, following which TPs would transport the cocaine to Canada and other American states for distribution.

Laundering of Drug Proceeds

d.    The Wedding Criminal Enterprise would conceal the significant proceeds of its cocaine sales in U.S. and Canadian dollars and cryptocurrencies.

e.    With respect to the use of cryptocurrencies, to obscure the original source of the funds, members and associates of the Wedding Criminal Enterprise would use a sophisticated Tether network to: (1) break large amounts of money into smaller transfers and (2) quickly use intermediary USDT wallets to move funds before ultimately reaching a hub Tether wallet controlled by defendant WEDDING.

f.    Defendants SOKOLOVSKI, HOSSAIN, and CANASTILLO-MADRID, and others known and unknown to the Grand Jury, would serve members and associates of the Wedding Criminal Enterprise, namely, defendant WEDDING and Clark, by concealing their drug trafficking proceeds and by using those proceeds to facilitate and further the objectives of the enterprise.  A truncated flow chart illustrating this laundering system is depicted in the diagram below.

15



Murders Committed in Furtherance of the Criminal Enterprise

g.   Members and associates of the Wedding Criminal Enterprise would murder individuals whom defendant WEDDING and Clark perceived to be a threat to the enterprise's operations.

1.   Victim A

h.   Defendant PARADKAR, and others known and unknown to the Grand Jury, would advise defendant WEDDING and Clark that Victim A's murder would benefit them by causing the federal indictment against them in Wedding I and related extradition proceedings to be dismissed.

i.   Defendant WEDDING would place a multimillion-dollar bounty on Victim A and enlist the services defendants FLOREZ and OHNA to locate and kill Victim A.

j.   Defendants OHNA, FLOREZ, CHAPMAN, DEMORIZI, and ZITOUN, and others known and unknown to the Grand Jury, would attempt to locate Victim A so that Victim A could be killed.

k.   Defendants BAL, BASORA-HERNANDEZ, and TEJEDA, and others known and unknown to the Grand Jury, would provide members of the conspiracy with information and services for the purpose of locating and killing Victim A.

16

l.    Defendant LNU 1 would stalk Victim A leading up to Victim A's murder.

m.    Defendant LNU 2 would shoot and kill Victim A.

n.    Defendants LNU 3 and 5 would serve as getaway drivers following Victim A's murder.

o.    Defendant LNU 4 would photograph Victim A's corpse, so that defendant WEDDING could circulate the photograph throughout the criminal underworld as a warning.

2.    Victims B, C, and D

p.    Defendant WEDDING and Clark would issue an order to kill CC-1, believing that CC-1 had stolen approximately 200 kilograms of cocaine from them.

q.    Clark would enlist the services of a Canadian-based assassin crew to murder CC-1.

r.    Members of the conspiracy would break into a house that Victims B, C, and D were renting and kill Victims B and C, and cause Victim D serious bodily injury.

C.    OVERT ACTS

43.    On or about the dates set forth below, in furtherance of the conspiracy and to achieve its object, defendants WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS, SOKOLOVSKI, HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California, and elsewhere:

April 9, 2024 to August 5, 2024: Defendant PARADKAR Retains Legal Counsel in Los Angeles County to Facilitate Defendant WEDDING and Clark's Monitoring of Ibragimov and Jimenez' Cases

Overt Act No. 1:    On April 9, 2024, in Riverside, California, Iriarte met Ibragimov and began transferring boxes filled with approximately 375.1 kilograms of cocaine from his car to Ibragimov's.

Overt Act No. 2:    No later than on or before May 3, 2024, defendant PARADKAR arranged for local counsel in Los Angeles County to represent Ibragimov so that defendant PARADKAR could monitor Ibragimov's case on behalf of defendant WEDDING and Clark.

Overt Act No. 3:    On August 1, 2024, Jimenez possessed approximately 201 kilograms of a mixture and substance containing a detectable amount of cocaine that belonged to the enterprise in a car parked outside of a residence in Moreno Valley, California.

Overt Act No. 4:    On August 2, 2024, via Threema and using coded language, Clark asked defendant PARADKAR to pay $5,000 to obtain Jimenez's arrest report.

Overt Act No. 5:    On August 2, 2024, via Threema, defendant PARADKAR informed Clark that he should be able to obtain a copy of a criminal complaint filed in support of Jimenez's arrest.

Overt Act No. 6:    On August 2, 2024, via email, defendant PARADKAR contacted local counsel in Los Angeles County and requested information about Jimenez's case.

Overt Act No. 7:    On August 2 and August 5, 2024, via Threema, defendant PARADKAR sent screenshots of email correspondence with local counsel in Los Angeles County regarding Jimenez's case to Clark.

October 1, 2024 to October 5, 2024: Defendant PARADKAR Facilitates Defendant WEDDING and Clark's Monitoring of Two TP Drivers' Cases in Arkansas Following Their Arrests

Overt Act No. 8:    On October 1, 2024, Dhillon and Singh possessed approximately 521.159 kilograms of a mixture and substance containing a detectable amount of cocaine that belonged to the enterprise in two cars they were driving in Hazen, Arkansas.



Overt Act No. 9:    On October 1, 2024, via Threema and using coded language, defendant WEDDING informed Clark that cocaine belonging to the Wedding Criminal Enterprise had been seized by law enforcement in Arkansas.

Overt Act No. 10:    On October 1, 2024, via Threema, defendant WEDDING sent Dhillon's name to Clark.

Overt Act No. 11:    On October 1, 2024, via Threema and using coded language, Clark asked defendant WEDDING if defendant WEDDING wanted defendant PARADKAR to monitor Dhillon and Singh's arrests, and defendant WEDDING responded affirmatively, suggesting that an American lawyer be used to obfuscate defendant PARADKAR's involvement.

Overt Act No. 12:    On October 1, 2024, Clark created a Threema group chat titled "911 arkansa," including defendant PARADKAR and a TP co-conspirator (CC-2).

<u>Overt Act No. 13:</u>   On October 1, 2024, in the Threema group chat, defendant PARADKAR asked CC-2 to provide the two drivers' names and driver's licenses.

<u>Overt Act No. 14:</u>   On October 1, 2024, in the Threema group chat, CC-2 provided Dhillon and Singh's names, following which defendant PARADKAR stated that he would "look into it" and asked if there were "any relatives" he could contact.

<u>Overt Act No. 15:</u>   On October 1, 2024, in the Threema group chat and using coded language, defendant PARADKAR advised that he was calling law enforcement to obtain information about Dhillon and Singh's arrests.

<u>Overt Act No. 16:</u>   On October 1, 2024, in the Threema group chat and using coded language, defendant PARADKAR advised that he located Singh (who was in prison) but could not ascertain Dhillon's whereabouts.

<u>Overt Act No. 17:</u>   On October 1, 2024, in the Threema group chat and using coded language, defendant PARADKAR directed CC-2 to send him the number of Singh's brother's and to tell Singh's brother that he was Singh's lawyer so that he could get Singh's arrest report.

<u>Overt Act No. 18:</u>   On or before October 2, 2024, defendant PARADKAR called Singh and asked him questions relating to his arrest while Clark covertly listened in.

<u>Overt Act No. 19:</u>   On October 3, 2024, on the Threema group chat, Clark and CC-2 discussed murdering Dhillon, following which defendant PARADKAR advised them to discuss the matter on a different chat without him present and to delete any and all discussion of the murder plot.

Overt Act No. 20:   On October 5, 2024, via Threema and using coded language, defendant WEDDING advised Clark that he and Clark needed to know what Dhillon "ha[d] to say."

Overt Act No. 21:   On October 5, 2024, via Threema, defendant PARADKAR sent Clark discovery related to Dhillon and Singh's arrests.

Overt Act No. 22:   On October 6, 2024, via WhatsApp and using coded language, defendant PARADKAR and Clark discussed questions for defendant PARADKAR to ask Dhillon, following which defendant PARADKAR deleted the messages and turned on WhatsApp disappearing messages.

Overt Act No. 23:   On October 6, 2024, defendant PARADKAR called Dhillon and asked him questions relating to his arrest while Clark covertly listened in.

September 11, 2024: Defendant PARADKAR Sends Clark Discovery Relating
to a Homicide Defendant WEDDING and Clark Ordered in Caledon,
Ontario, Canada

Overt Act No. 24:   On or before November 20, 2023, defendant WEDDING and Clark issued an order to kill a TP driver co-conspirator (CC-1) whom they believed stole 300 kilograms of cocaine from them.

Overt Act No. 25:   On November 20, 2023, members of the conspiracy broke into a rental property in Caledon inhabited by Victims B, C, and D.

Overt Act No. 26:   On November 20, 2023, members of the conspiracy shot and killed Victims B and C and shot and wounded Victim D, mistakenly believing that they were CC-1's family members.

Overt Act No. 27:   On September 11, 2024, via Threema, defendant PARADKAR sent Clark screenshots of evidence obtained by the Ontario Provincial Police during its investigation of the shootings of Victims B, C, and D.

August 15, 2024 to January 31, 2025: Defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, Participate in a Plot to Murder Victim A in Medellín

Overt Act No. 28:   Between August 15, 2024, and September 6, 2024, using Victim A as an intermediary, defendant WEDDING purchased 300 kilograms of cocaine to be shipped from Colombia to Mexico.

Overt Act No. 29:   In September 2024, defendant RIASCOS received an order for 300 kilograms of cocaine from defendant WEDDING through an intermediary.

Overt Act No. 30:   On September 9, 2024, during an in-person meeting in Cali, Colombia, defendant RIASCOS stated that the cocaine order would be in production soon.

Overt Act No. 31:   On September 11, 2024, defendant RIASCOS received approximately $2,000,000,000 COP, which had been converted from cryptocurrency, as payment for the approximately 300 kilograms of cocaine.

Overt Act No. 32:   On or before September 26, 2024, defendant RIASCOS initiated a shipment of approximately 240 bricks containing cocaine, including those depicted below:

 

Overt Act No. 33:   Between September 25, 2024, and September 26, 2024, in Cali, members of the conspiracy possessed with intent to distribute approximately 240 bricks containing cocaine, as depicted below:





Overt Act No. 34:   On or after October 17, 2024, defendant PARADKAR advised defendant WEDDING and Clark that if Victim A was killed, the charges against them in Wedding I and related extradition proceedings would necessarily be dismissed.

Overt Act No. 35:   On or after October 17, 2024, defendant WEDDING placed a bounty of up to $5 million USD on Victim A in exchange for any person locating and killing Victim A.

Overt Act No. 36:   On or after October 17, 2024, defendant WEDDING enlisted defendants OHANA and FLOREZ's assistance in locating Victim A so that Victim A could be killed.

1        <u>Overt Act No. 37:</u>   On November 5, 2024, via Instagram,

2    defendant BAL posted a story depicting Victim A accompanied by the

3    following text: "This guy single handedly 🐿 out one of the strongest

4    underworld networks that this 🌍 has seen Good chance he'll never be

5    found again."

6        <u>Overt Act No. 38:</u>   On November 5, 2024, via Instagram,

7    defendant BAL posted a story depicting a photograph of Victim A and

8    his significant other accompanied by screenshots of text messages

9    from defendant CHAPMAN that called Victim A "a snitch" and sought

10   Victim A's location for the purpose of killing Victim A.

11       <u>Overt Act No. 39:</u>   In October 2024, defendant CHAPMAN paid

12   defendant BAL approximately $10,000 CAD not to post about defendant

13   WEDDING and Clark and instead to post about Victim A so that

14   enterprise members and associates could locate and kill Victim A.

15       <u>Overt Act No. 40:</u>   On or before November 20, 2024, defendant

16   OHNA enlisted defendant DEMORIZI to contact defendant BASORA-

17   HERNANDEZ and obtain Victim A's cellphone number.

18       <u>Overt Act No. 41:</u>   On or before November 20, 2024, defendant

19   DEMORIZI requested Victim A's contact information from defendant

20   BASORA-HERNANDEZ so that members and associates of the enterprise

21   could locate and kill Victim A.

22       <u>Overt Act No. 42:</u>   On or before November 20, 2024, defendant

23   BASORA-HERNANDEZ provided defendant DEMORIZI with Victim A's

24   cellphone number and email address in exchange for between

25   approximately $500 and $1,000 CAN.

26       <u>Overt Act No. 43:</u>   In November 2024, defendant OHNA obtained

27   identifying information for an associate of Victim A's from Victim

28

A's close friend (CC-3), in exchange for defendant WEDDING financing CC-3's cosmetic surgery.

Overt Act No. 44:  In November 2024, defendant OHNA provided defendant WEDDING with the identifying information regarding Victim A's associate, and defendant WEDDING provided it to defendant FLOREZ.

Overt Act No. 45:  In November 2024, via WhatsApp, defendant FLOREZ sent defendant TEJEDA a photograph of Victim A's associate and asked defendant TEJEDA to confirm the associate's identity and to provide the associate's personal information, which defendant TEJEDA did.

Overt Act No. 46:  On November 5, 2024, via WhatsApp, defendant FLOREZ sent defendant TEJEDA a photograph of Victim A and asked if defendant TEJEDA knew Victim A, to which defendant TEJEDA responded that she did not.

Overt Act No. 47:  On or after November 5, 2024, via video call, defendants WEDDING and FLOREZ asked defendant TEJEDA to travel to Colombia to lure Victim A to a location to be killed in exchange for payment of defendant TEJADA's mortgage and corrective cosmetic surgery.

Overt Act No. 48:  On or before December 3, 2024, defendant BASORA-HERNANDEZ informed defendant DEMORIZI that Canadian law enforcement approached him to discuss Victim A.

Overt Act No. 49:  On or before December 3, 2024, defendant WEDDING, under the guise of being an attorney, facilitated a phone conversation with defendant BASORA-HERNANDEZ and defendant PARADKAR, during which defendant BASORA-HERNANDEZ told them that Canadian law enforcement approached him seeking Victim A's whereabouts.

Overt Act No. 50:   In or before December 2024, defendant WEDDING paid approximately $18,500 for an on-device interception tool to be employed on Victim A's cellular phone so that Victim A could be located and killed.

Overt Act No. 51:   In January 2025, Clark hired defendant ZITOUN to locate Victim A for approximately $10,000 CAD plus expenses.

Overt Act No. 52:   In January 2025, on orders from defendant WEDDING and Clark, defendant ZITOUN travelled to Medellín and Mecca to locate Victim A.

Overt Act No. 53:   In January 2025, while defendant ZITOUN was in Mecca, Clark offered defendant ZITOUN the contract to kill Victim A, which defendant ZITOUN declined.

Overt Act No. 54:   In January 2025, following his trip to Mecca, defendant ZITOUN received approximately $40,000 CAD for attempting to locate Victim A.

Overt Act No. 55:   On January 29, 2025, via Threema, defendant WEDDING sent Clark surveillance footage of Victim A and his associate.

Overt Act No. 56:   On January 31, 2025, prior to Victim A's murder, LNU 4 cased the Restaurant.

Overt Act No. 57:   On January 31, 2025, LNU 1 followed Victim A on a motorcycle to the Restaurant prior to Victim A's murder.

Overt Act No. 58:   On January 31, 2025, before Victim A's murder, LNU 3 drove LNU 2 to the Restaurant and dropped LNU 2 off.

Overt Act No. 59:   On January 31, 2025, LNU 2 entered the Restaurant, approached the table where Victim A was eating, and shot Victim A approximately five times in the head, killing Victim A.

1    Overt Act No. 60:   On January 31, 2025, after Victim A's
2 murder, LNU 2 fled from the Restaurant on a motorcycle and met with
3 LNU 3 at a nearby rendezvous point, at which point LNU 2 abandoned
4 the motorcycle and continued his escape in LNU 3's car.

5    Overt Act No. 61:   On January 31, 2025, LNU 4 photographed
6 Victim A's dead body.

7    Overt Act No. 62:   On January 31, 2025, after LNU 4
8 photographed Victim A's corpse, LNU 5 picked LNU 4 up from the
9 Restaurant, and they fled from the murder scene, using the same route
10 as LNU 2 and LNU 3.

11    Overt Act No. 63:   On January 31, 2025, via Threema, defendant
12 WEDDING informed Clark that Victim A was dead and sent Clark a
13 photograph of Victim A's corpse.

14    Overt Act No. 64:   On January 31, 2025, via Instagram,
15 defendant BAL posted a story depicting a photograph of the Restaurant
16 and the bottom part of a body lying on the ground, and a caption that
17 read: "[Victim A] down…" and "BOOM! Headshot."

18    Overt Act No. 65:   On January 31, 2025, via Instagram, BAL
19 posted a photograph depicting a screenshot of a Colombian news report
20 on Victim A's murder accompanied with the following caption: "'One of
21 the informants involved in dismantling Ryan 'Snowboarder aka SB'
22 Wedding's transnational organization/ criminal network has been
23 assassinated in Colombia.  As soon as the world learned who SB was
24 (USA X Canada Investigations gone public via media releases), there
25 were bounties being placed on every individual involved in
26 'snitching' on the kingpins operations.  Some of these bounties were
27 being reported as 7 figure hits.  It turns out they got [Victim A] in
28 #Colombia He got hit with a sniper while sitting at a restaurant.

The criminal underworld will always find you.  The world isn't big enough to hide."

Overt Act No. 66:   On or after January 31, 2025, via Threema, defendant WEDDING facilitated an approximately 500,000 USDT payment to members of the conspiracy in Colombia.

Overt Act No. 67:   On or after January 31, 2025, defendant OHNA contacted Clark and requested approximately $300,000 CAD as payment for facilitating Victim A's murder.

Overt Act No. 68:   On or after January 31, 2025, defendant WEDDING instructed Clark to pay defendant OHNA for his role in Victim A's murder.

Overt Act No. 69:   On or after January 31, 2025, defendant OHNA received approximately $150,000 CAD and 30 kilograms of cocaine as payment for facilitating Victim A's murder.

Overt Act No. 70:   On or after January 31, 2025, defendant SOKOLOVSKI made a bejeweled necklace for defendant OHNA as a reward for his role in Victim A's murder.

<u>LAUNDERING OF DRUG PROCEEDS</u>

Overt Act No. 71:   Between September 28, 2023, and May 28, 2024, defendant SOKOLOVSKI received in his Kucoin account (-4119) approximately 20,501,784.29 USDT from a Tether wallet controlled by a member of the conspiracy (-9BU3).

Overt Act No. 72:   Between May 29, 2024, and August 15, 2024, defendant HOSSAIN received in his Tether wallet (-3FcL) approximately 48,492,620 USDT from a Tether wallet controlled by a member of the conspiracy (-79wf).

Overt Act No. 73:   Between May 29, 2024, and August 14, 2024, a member of the conspiracy used a Tether wallet (-79wf) to send

1  approximately 8,090,526 USDT to defendant SOKOLOVSKI's Kucoin account

2  (-4119).

3      Overt Act No. 74:    Between May 29, 2024, and August 12, 2024,

4  defendant SOKOLOVSKI used his Kucoin account (-4119) to send

5  approximately 9,838,397.84 USDT to a Tether wallet controlled by a

6  member of the conspiracy (-79wf).

7      Overt Act No. 75:    Between June 14, 2024, and October 1, 2024,

8  defendant HOSSAIN used his Tether wallets (-yoQi and -MtEj) to send

9  approximately 3,091,001.13 USDT to one of defendant CANASTILLO-

10 MADRID's TRON wallets (-4n8E).

11     Overt Act No. 76:    Between April 29, 2024, and October 8, 2024,

12 defendant HOSSAIN used a Tether wallet (-yoQi) to send approximately

13 98.86% of its total funds, that is, approximately 207,808,779 USDT,

14 to defendant WEDDING's Tether wallet (-g1P1).

15     Overt Act No. 77:    On June 18, 2024, Bonilla transferred

16 approximately 17,300 USDT into defendant HOSSAIN's Tether wallet

17 (-yoQi) to settle a drug debt with defendant WEDDING and Clark.

18     Overt Act No. 78:    Between July 9, 2024, and November 5, 2024,

19 defendant CANASTILLO-MADRID received approximately 507,078 USDT to

20 her two TRON wallets (-4n8E and -SG8z) from a Tether wallet

21 controlled by Clark (-rg2a).

22     Overt Act No. 79:    Between July 12, 2024, and September 11,

23 2024, defendant CANASTILLO-MADRID received approximately 640,367 USDT

24 to her two TRON wallets (-4n8E and -SG8z) from defendant WEDDING's

25 Tether wallet (-g1P1).

26     Overt Act No. 80:    Between August 15, 2024, and September 7,

27 2024, using a Tether wallet (-g1P1), defendant WEDDING provided

28 Victim A, who was acting as an intermediary, with approximately

564,571 USDT to purchase approximately 300 kilograms of cocaine from defendant RIASCOS in Colombia.

Overt Act No. 81:   Between August 16, 2024, and September 24, 2024, defendant SOKOLOVSKI used his Kucoin account (-4119) to send approximately 96,698.50 USDT to -efTu (a Tether wallet controlled by a member of the conspiracy).

Overt Act No. 82:   Between June 14, 2024, and October 1, 2024, defendant CANASTILLO-MADRID received approximately 3,091,001.13 USDT into her two TRON wallets (-4n8E and -SG8z) from three Tether wallets controlled by defendant HOSSAIN (-3FcL, -yoQi, and -MtEj).

1          COUNT TWO

2          [21 U.S.C. § 963]

3    [DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS, SOKOLOVSKI,

4     HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-

5          HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

6          44.  The Grand Jury realleges paragraphs 1 through 39 here.

7    A.   OBJECT OF THE CONSPIRACY

8          45.  Beginning no later than on or about December 7, 2011, and

9    continuing until on or about October 28, 2025, in Los Angeles,

10   Riverside, and San Bernardino Counties, within the Central District

11   of California, in the countries of Mexico, Colombia, and Canada, and

12   elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS,

13   SOKOLOVSKI, HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN,

14   BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5,

15   and others known and unknown to the Grand Jury, conspired with each

16   other to knowingly and intentionally export from the United States at

17   least five kilograms of a mixture and substance containing a

18   detectable amount of cocaine, a Schedule II narcotic drug controlled

19   substance, in violation of Title 21, United States Code, Sections

20   953(a), 960(a)(1), (b)(1)(B)(ii).

21   B.   MANNER AND MEANS OF THE CONSPIRACY

22         46.  The object of the conspiracy was to be accomplished, in

23   substance, through the manner and means set forth in Paragraph 42 of

24   this Indictment.

25   C.   OVERT ACTS

26         47.  On or about the dates set forth below, in furtherance of

27   the conspiracy and to achieve its object, defendants WEDDING,

28   PARADKAR, OHNA, FLOREZ, RIASCOS, SOKOLOVSKI, HOSSAIN, CANASTILLO-

MADRID, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, committed overt acts in the Central District of California, and elsewhere, including the overt acts set forth in paragraph 43 of this Indictment, among others.

COUNT THREE

[21 U.S.C. §§ 846, 848(e)(1)(A)]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI,

ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4,

AND LNU 5]

48.   The Grand Jury realleges paragraphs 1 through 39 and 42(g) to 42(o) here.

49.   Beginning no later than on or about October 17, 2024, and continuing until on or about January 31, 2025, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, in the countries of Mexico, Colombia, and Canada, and elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, while engaging in and working in furtherance of a continuing criminal enterprise, and while engaged in an offense punishable under Title 21, United States Code, Section 841(b)(1)(A) or 960(b)(1), namely:

(1)   conspiracy to possess with intent to distribute at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii)(II); and

(2)   conspiracy to export from the United States at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 953(a), 960(a)(1), (b)(1)(B)(ii);

1  conspired to intentionally kill and counsel, command, induce,
2  procure, and cause the intentional killing of another person, namely,
3  Victim A, and such killing did result.

COUNT FOUR

[21 U.S.C. § 848(e)(1)(A); 18 U.S.C. § 2]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI,
ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4,
AND LNU 5]

50.   The Grand Jury realleges paragraphs 1 through 39 here.

51.   On or about January 31, 2025, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, in the countries of Mexico, Colombia, and Canada, and elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, each aiding and abetting the others, while engaging in and working in furtherance of a continuing criminal enterprise, and while engaged in an offense punishable under Title 21, United States Code, Section 841(b)(1)(A) or 960(b)(1), namely:

(1)   conspiracy to possess with intent to distribute at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii)(II); and

(2)   conspiracy to export from the United States at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 953(a), 960(a)(1), (b)(1)(B)(ii);

intentionally killed and counseled, commanded, induced, procured, and caused the intentional killing of another person, namely, Victim A, and such killing did result.

COUNT FIVE

[18 U.S.C. § 1512(k)]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI,
ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4,
AND LNU 5]

52.  The Grand Jury realleges paragraphs 1 through 39 here.

A.  THE OBJECTS OF THE CONSPIRACY

53.  Beginning no later than on or about October 17, 2024, and
continuing until on or about January 31, 2025, in Los Angeles,
Riverside, and San Bernardino Counties, within the Central District
of California, in the countries of Mexico, Colombia, and Canada, and
elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN,
DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3,
LNU 4, and LNU 5, and others known and unknown to the Grand Jury,
conspired to knowingly and intentionally kill Victim A to:

a.  prevent the attendance and testimony of Victim A in an
official proceeding; and

b.  prevent the communication by Victim A to a law
enforcement officer and judge of the United States of information
relating to the commission and possible commission of a Federal
offense, in violation of Title 18, United States Code, Section
1512(a)(1).

B.  MANNER AND MEANS OF THE CONSPIRACY

54.  The objects of the conspiracy were to be accomplished, in
substance, through the manner and means set forth in Paragraphs 42(g)
to 42(o) of this Indictment.

37

1   C.   <u>OVERT ACTS</u>

2       55.   On or about the dates set forth below, in furtherance of

3   the conspiracy and to achieve its objects, defendants WEDDING,

4   PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-

5   HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others

6   known and unknown to the Grand Jury, committed overt acts in the

7   Central District of California, and elsewhere, including the overt

8   acts set forth in paragraph 42 of this Indictment, overt acts 28

9   through 70.

COUNT SIX

[18 U.S.C. §§ 1512(a)(1)(A), (C), (3)(A), 2]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

56. The Grand Jury realleges paragraphs 1 through 39 here.

57. On January 31, 2025, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, in the countries of Mexico, Colombia, and Canada, and elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and intentionally killed Victim A and willfully caused Victim A to be killed to prevent the attendance and testimony of Victim A in an official proceeding and the communication by Victim A to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a Federal offense.

COUNT SEVEN

[18 U.S.C. § 1513(f)]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

58.  The Grand Jury realleges paragraphs 1 through 39 here.

A.   THE OBJECTS OF THE CONSPIRACY

59.  Beginning no later than on or about October 17, 2024, and continuing until on or about January 31, 2025, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, in the countries of Mexico, Colombia, and Canada, and elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, conspired to knowingly and intentionally kill Victim A to retaliate against Victim A for the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding and providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense, in violation of Title 18, United States Code, Section 1513(a).

B.   MANNER AND MEANS OF THE CONSPIRACY

60.  The objects of the conspiracy were to be accomplished, in substance, through the manner and means set forth in Paragraphs 42(g) to 42(o) of this Indictment.

C.   OVERT ACTS

61.  On or about the dates set forth below, in furtherance of the conspiracy and to achieve its objects, defendants WEDDING,

PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-
HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others
known and unknown to the Grand Jury, committed overt acts in the
Central District of California, and elsewhere, including the overt
acts set forth in paragraph 42 of this Indictment, overt acts 28
through 70.

COUNT EIGHT

[18 U.S.C. §§ 1513(a)(1)(A), (B), (2)(A), 2]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

62.   The Grand Jury realleges paragraphs 1 through 39 here.

63.   On January 31, 2025, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, in the countries of Mexico, Colombia, and Canada, and elsewhere, defendants WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, and LNU 5, and others known and unknown to the Grand Jury, each aiding and abetting the others, knowingly and intentionally killed Victim A and willfully caused Victim to be killed to retaliate against Victim A for the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding, and providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense.

COUNT NINE

[18 U.S.C. § 1956(h)]

[DEFENDANTS WEDDING, SOKOLOVSKI, HOSSAIN, AND CANASTILLO-MADRID]

64.  The Grand Jury realleges paragraphs 1 through 39 here.

A.  THE OBJECTS OF THE CONSPIRACY

65.  Beginning no later than on or about December 7, 2011, and continuing until on or about October 28, 2025, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, in the countries of Mexico, Colombia, and Canada, and elsewhere, defendants WEDDING, SOKOLOVSKI, HOSSAIN, and CANASTILLO-MADRID, and others known and unknown to the Grand Jury, conspired to commit the following offenses:

(1)  to knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and exportation of controlled substances, in violation of Title 21, United States Code, Section 953(a), and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

(2)  to knowingly and intentionally transport, transmit, and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to

43

1    a place in the United States from and through a place outside the

2    United States with the intent to promote the carrying on of specified

3    unlawful activity, that is, murder, tampering with a witness, victim,

4    or an informant, in violation of Title 18, United States Code,

5    Section 1512, and retaliation against a witness, victim, or an

6    informant, in violation of Title 18, United States Code, Section

7    1513; and

8        (3)  to knowingly and intentionally transport, transmit, and

9    transfer a monetary instrument or funds from a place in the

10   United States to and through a place outside the United States and to

11   a place in the United States from and through a place outside the

12   United States knowing that the monetary instrument and funds involved

13   in the transportation, transmission, and transfer represent

14   the proceeds of some form of unlawful activity, and which property

15   was, in fact, the proceeds of specified unlawful activity, that is,

16   distribution of controlled substances, in violation of Title 21,

17   United States Code, Section 841(a)(1), and exportation of controlled

18   substances, in violation of Title 21, United States Code, Section

19   953(a), and knowing that such transportation, transmission, and

20   transfer was designed in whole and in part to conceal and disguise

21   the nature, the location, the source, the ownership, and the control

22   of the proceeds of specified unlawful activity, that is, the unlawful

23   distribution of controlled substances, in violation of Title 21,

24   United States Code, Section 841(a)(1), in violation of Title 18,

25   United States Code, Section 1956(a)(2)(B)(i).

26

27

28

1  B.    MANNER AND MEANS OF THE CONSPIRACY

2       66.   The objects of the conspiracy were to be accomplished, in

3  substance, through the manner and means set forth in Paragraph 42(d)

4  to 42(f) of this Indictment.

5  C.    OVERT ACTS

6       67.   On or about the dates set forth below, in furtherance of

7  the conspiracy and to achieve its objects, defendants WEDDING,

8  SOKOLOVSKI, HOSSAIN, AND CANASTILLO-MADRID, and others known and

9  unknown to the Grand Jury, committed overt acts in the Central

10  District of California, and elsewhere, including the overt acts set

11  forth in paragraph 43 of this Indictment, overt acts 71 through 82.

SENTENCING ALLEGATION

[DEFENDANT WEDDING]

68.  Defendant WEDDING, prior to committing the offenses alleged in Counts One and Two of this Indictment, had been finally convicted of a serious drug felony as that term is defined and used in Title 21, United States Code, Sections 802(57), 841, and 960, namely, Conspiracy to Distribute Cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, in the United States District Court for the Southern District of California, case number 3:08-cr-02386-JM-3, on or about November 30, 2009, for which defendant WEDDING served a term of imprisonment of more than 12 months.

69.  Defendant WEDDING was released from a term of imprisonment for that offense within 15 years of the commencement of the offenses alleged in Counts One and Two of this Indictment.

FORFEITURE ALLEGATION ONE

[21 U.S.C. § 853]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS, SOKOLOVSKI, HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

1.     Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 21, United States Code, Section 853, in the event of any defendant's conviction of the offense set forth in any of Counts One, Three, or Four of this Indictment.

2.     Any defendant so convicted, shall forfeit to the United States of America the following:

(a)  All right, title and interest in any and all property, real or personal, constituting or derived from, any proceeds which the defendant obtained, directly or indirectly, from such offense;

(b)  All right, title and interest in any and all property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offense;

(c)  All right, title, and interest in any firearm or ammunition involved in or used in such offense; and

(d)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a), (b), and (c).

3.     Pursuant to Title 21, United States Code, Section 853(p), any defendant so convicted, shall forfeit substitute property if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located

upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1                           FORFEITURE ALLEGATION TWO

2                              [21 U.S.C. §§ 853 and 970]

3     [DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, RIASCOS, SOKOLOVSKI,

4     HOSSAIN, CANASTILLO-MADRID, CHAPMAN, DEMORIZI, ZITOUN, BAL, BASORA-

5            HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4, AND LNU 5]

6          1.   Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

7     Procedure, notice is hereby given that the United States of America

8     will seek forfeiture as part of any sentence, pursuant to Title 21,

9     United States Code, Sections 853 and 970, in the event of any

10    defendant's conviction of the offense set forth in Count Two of this

11    Indictment.

12         2.   Any defendant so convicted, shall forfeit to the United

13    States of America the following:

14         (a)   All right, title and interest in any and all property,

15    real or personal, constituting or derived from, any proceeds which

16    the defendant obtained, directly or indirectly, from such offense;

17         (b)   All right, title and interest in any and all property,

18    real or personal, used, or intended to be used, in any manner or

19    part, to commit, or to facilitate the commission of such offense;

20         (c)   All right, title, and interest in any firearm or

21    ammunition involved in or used in such offense; and

22         (d)   To the extent such property is not available for

23    forfeiture, a sum of money equal to the total value of the property

24    described in subparagraphs (a), (b), and (c).

25         3.   Pursuant to Title 21, United States Code, Section 853(p),

26    any defendant so convicted, shall forfeit substitute property if, by

27    any act or omission of said defendant, the property described in the

28    preceding paragraph, or any portion thereof: (a) cannot be located

                                        49

upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

[DEFENDANTS WEDDING, PARADKAR, OHNA, FLOREZ, CHAPMAN, DEMORIZI,

ZITOUN, BAL, BASORA-HERNANDEZ, TEJEDA, LNU 1, LNU 2, LNU 3, LNU 4,

AND LNU 5]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in any of Counts Five through Eight of this Indictment.

2.    Any defendant so convicted, shall forfeit to the United States of America the following:

(a)   All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense;

(b)   All right, title, and interest in any firearm or ammunition involved in or used in such offense; and

(c)   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a)

51

cannot be located upon the exercise of due diligence; (b) has been
transferred, sold to or deposited with a third party; (c) has been
placed beyond the jurisdiction of the court; (d) has been
substantially diminished in value; or (e) has been commingled with
other property that cannot be divided without difficulty.

1

FORFEITURE ALLEGATION FOUR

2

[18 U.S.C. § 982]

3

[DEFENDANTS WEDDING, SOKOLOVSKI, HOSSAIN, AND CANASTILLO-MADRID]

4 1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal
5 Procedure, notice is hereby given that the United States will seek
6 forfeiture as part of any sentence, pursuant to Title 18, United
7 States Code, Section 982(a)(1), in the event of any defendant's
8 conviction of the offense set forth in Count Nine of this Indictment.

9 2. Any defendant so convicted shall forfeit to the United
10 States of America the following:

11 (a) Any property, real or personal, involved in such
12 offense, and any property traceable to such property; and

13 (b) To the extent such property is not available for
14 forfeiture, a sum of money equal to the total value of the property
15 described in subparagraph (a).

16 3. Pursuant to Title 21, United States Code, Section 853(p),
17 as incorporated by Title 18, United States Code, Section 982(b)(1),
18 and Title 18, United States Code, Section 982(b)(2), any defendant so
19 convicted shall forfeit substitute property, if, by any act or
20 omission of said defendant, the property described in the preceding
21 paragraph, or any portion thereof: (a) cannot be located upon the
22 exercise of due diligence; (b) has been transferred, sold to, or
23 deposited with a third party; (c) has been placed beyond the
24 jurisdiction of the court; (d) has been substantially diminished in
25 value; or (e) has been commingled with other property that cannot be
26 divided without difficulty. Substitution of assets shall not be
27 ordered, however, where the convicted defendant acted merely as an
28 intermediary who handled but did not retain the property in the

1    course of the money laundering offense unless the defendant, in

2    committing the offense or offenses giving rise to the forfeiture,

3    conducted three or more separate transactions involving a total of

4    $100,000.00 or more in any twelve-month period.

5

6                                        A TRUE BILL

7

8                                        /S/
                                         _____
9                                        Foreperson

10   BILAL A. ESSAYLI
     Acting United States Attorney
11

12

13   ALEXANDER B. SCHWAB
     Assistant United States Attorney
14   Acting Chief, Criminal Division

15   KEVIN J. BUTLER
     Assistant United States Attorney
16   Acting Chief, Major Crimes
     Section
17

18   LYNDSI ALLSOP
     Assistant United States Attorney
19   Deputy Chief, Major Crimes
     Section
20

     KENNETH R. CARBAJAL
21   Assistant United States Attorney
     Major Crimes Section

22

23

24

25

26

27

28